# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| WAR HORSE NEWS, INC., *et al*,<br><br>        Plaintiffs,<br><br>        v.<br><br>U.S. DEPARTMENT OF THE NAVY, *et al.*,<br><br>        Defendants. | Civil Action No. 22-cv-03303 (TSC) |

## <u>MEMORANDUM OPINION</u>

In this Freedom of Information Act ("FOIA") suit, Plaintiffs War Horse News, Inc. ("War Horse") and Thomas J. Brennan seek information contained in a Marine Corps database for reporting and tracking officer misconduct and substandard performance cases. Plaintiffs sued the Department of the Navy ("Navy") and Headquarters, U.S. Marine Corps ("HMC") for failure to produce documents responsive to their FOIA request. Defendants moved for judgment on the pleadings or, in the alternative, for summary judgment on the grounds that Plaintiffs' request did not adequately describe the records sought and, in any event, Defendants properly withheld all records in the database at issue. Defs.' Mot. for J. on the Pleadings or Summ. J. ("HMC MSJ"), ECF No. 21. Plaintiffs cross-moved for summary judgment, arguing that their request was adequate, that Defendants failed to identify and produce segregable information, and that the claimed exemptions are inapplicable. Pls.' Cross-Mot. for Summ. J. and Opp'n to HMC MSJ ("Pls.' Cross-MSJ"), ECF No. 28.

Having considered the record and the parties' briefing, the court will DENY Defendants' motion and GRANT in part Plaintiffs' cross-motion for the reasons below. This matter will be remanded to the Navy and HMC for further findings as to segregability.

## I.    BACKGROUND

The following background is taken from the parties' declarations.  Defendants submitted two declarations from Katherine J. Estes, a Marine Corps Attorney Advisor who leads the Marine Corps' Military Personnel Law Branch.  Decl. of Katherine J. Estes ("Estes Decl.") ¶ 1, ECF No. 21-1; *see also* Suppl. Decl. of Katherine J. Estes ("2nd Estes Decl.") ¶ 1, ECF No. 35-1.  Estes served 26 years on active duty and has led the Military Personnel Law Branch since 2019.  Estes Decl. ¶ 2.  In her current role she supervises the processing of Marine Corps officer misconduct and promotion cases; her office is responsible for providing legal advice on military personnel law matters to, among others, the Commandant of the Marine Corps (its highest-ranking officer who serves on the Joint Chiefs of Staff) and his principal uniformed legal advisor, the Staff Judge Advocate to the Commandant.  *Id.* ¶¶ 2, 14; *see also* Pls.' Cross-MSJ at 2 n.1.  Because the Secretary of the Navy relies on the Commandant's recommendations when reviewing promotions for Marine Corps officers and the Commandant in turn relies on the Military Personnel Branch, Estes's office is responsible for identifying and tracking officers with potentially adverse information; ensuring efficient and accurate processing of officer misconduct and substandard performance cases; and advising the Commandant regarding officer promotion and assignment issues.  2nd Estes Decl. ¶ 3.

Plaintiffs submitted four declarations, the first by Plaintiff Brennan, a veteran enlisted Marine and the founder and Executive Director of War Horse.  *See* Decl. of Thomas J. Brennan ("Brennan Decl.") ¶¶ 1–2, ECF No. 28-3.  Don M. Christensen, a retired Air Force Colonel with 23 years of experience as a military prosecutor, defense attorney, and judge submitted Plaintiffs' second declaration.  Decl. of Don M. Christensen ("Christensen Decl.") ¶ 1, ECF No. 28-5.  Plaintiffs' third declaration is by Robert G. Bracknell, a retired Marine Corps Lieutenant Colonel with 22 years of experience as a Marine Corps officer and lawyer with firsthand experience and

knowledge of the database at issue.  Decl. of Robert Bracknell ("Bracknell Decl.") ¶¶ 1–3, ECF No. 30-2.  Counsel for Plaintiffs David Nordlinger submitted a final declaration authenticating several exhibits that assisted the court in resolving the pending motions.  *See* Decl. of David Nordlinger ("Nordlinger Decl.") ¶¶ 4–7, ECF No. 28-7.

A.    **Plaintiff's FOIA Request**

War Horse is a nonprofit newsroom focusing on veterans and the military.  Brennan Decl. ¶ 2.  Brennan is a combat-wounded former enlisted Marine who served in Iraq and Afghanistan during the Iraq War.  *Id.* ¶¶ 3–8.  He earned a degree in journalism following his medical retirement from the Marines and a Masters in investigative journalism from Columbia in 2015. *Id.* ¶ 9.  Brennan founded War Horse to address the gap between veterans, military families, and the communities they serve; to correct a dearth of reporting on veterans' affairs; and to hold military leaders to account.  *Id.* ¶ 11.

War Horse's investigative reporting aims to shed light on the military and military justice system, raise awareness of systemic issues impacting service members, and to call for change where required.  *Id.* ¶ 2.  Its reporting has led to multiple changes in military policy and federal law, including provisions barring the wrongful distribution of revenge porn under the Uniform Code of Military Justice.  *Id.* ¶¶ 12, 14, 17; *see also* 10 U.S.C. § 917a.  Brennan submitted the FOIA request at issue as part of a yearlong investigation into the military justice system and its lack of accountability in the officer corps.  Brennan Decl. ¶ 2; *see also id.* ¶¶ 19, 21–22.

Brennan's FOIA request to HMC in June 2022 sought records contained in the Officer Disciplinary Notebook Management System ("ODNMS"), described in detail in the following section:

> I seek a full copy of the Officer Disciplinary Notebook Management System (ODNMS) database. Releasable information should also include all edit histories to ODNMS entries and contain all ODNMS records since inception. The location, use, and description of the ODNMS can be found here: https://thewarhorse.org/wp-content/uploads/2022/04/ODNMS-Users-Guide-10-Jan-14.pdf.

Compl. ¶ 22, ECF No. 1 & Ex. A, ECF No. 1-2 (the Complaint contains the only full copy of Plaintiffs' FOIA request); *see also* Estes Decl. ¶ 5, Ex. A at 3, ECF No. 21-2. The link directs to a 52-page slide deck titled "ODNMS User's Guide, Headquarters Marine Corps, Judge Advocate Division, Updated January 2014." Nordlinger Decl. ¶ 4, Ex. 2 ("User Guide"), ECF No. 28-8. The User Guide provides step-by-step instructions and guidance explaining how to enter new cases into the ODNMS and update pending cases. Bracknell Decl. ¶¶ 10, 13. The User Guide was previously available to the public. Nordlinger Decl. ¶ 4. HMC's declarant states that the User Guide "is no longer current" and was removed from public access after an April 2022 update to the software used to maintain the current version of the ODNMS. 2nd Estes Decl. ¶ 38.

## B.   Officer Disciplinary Notebook Management System

The ODNMS is the Marine Corps' internet-based database for reporting and tracking officer misconduct and substandard performance cases. HMC MSJ at 1–2; *see also* Marine Corps Order 5800.16, Changes 1-7, Volume 15 ("MCO 5800.16") ¶ 010405 (Aug. 8, 2018), https://perma.cc/TC9E-5FU9.[1] Its development, current form, and uses are described below. At the outset, the court notes that the ODNMS is distinct from the "Wolverine" database maintained by Marine Corps prosecutors to track their cases. Pls.' Cross-MSJ at 2. The ODNMS instead

---

[1] Volume 15 of Marine Corps Order 5800.16, HMC's Legal Support and Administration Manual, is available as an exhibit to the Nordlinger Declaration and at the following link: https://www.marines.mil/Portals/1/Publications/MCO%205800.16%20Volume%2015.pdf?ver=2018-08-16-080917-883. *See* Nordlinger Decl. ¶ 6, Ex. 5.

allows the Marine Corps to "administratively track the development" of misconduct or substandard performance cases.  2nd Estes Decl. ¶ 24.

     *i.*    <u>*Development*</u>

A version of the ODNMS has existed in some form since the 1990s and evolved over time.  Estes Decl. ¶ 20.  Marine Corps guidelines in 2003 began requiring senior officers to establish an internal case tracking system for all reported officer misconduct and to review it at least monthly.  *Id.*  Marine Corps personnel used a software program referred to as the Officer Disciplinary Notebook Management System to comply with that directive.  *Id.* at ¶ 21.  When an incident reported in the system was adjudicated and the case closed, the system entry would reflect that closure and closed cases were eventually transferred to a "separate archive file in Lotus Notes software program."  *Id.*  HMC states that the archive "at that time"—presumably the early 2000s—contained cases dating back to approximately 1993.  *Id.*

The Marine Corps sought to upgrade this system beginning in 2011, and by 2014 new internal regulations required staff judge advocates to report and track officer misconduct and substandard performance cases in an updated Officer Disciplinary Notebook Management System, rather than the internal spreadsheets the Marine Corps previously used.  *Id.* at ¶ 22.  This version was replaced in April 2022 by the Officer Disciplinary Notebook Management System 2.0 ("ODNMS 2.0").  *Id.* at ¶ 23.  Approximately 10 years' worth of officer misconduct, substandard performance, and promotion entries were migrated to the new Officer Disciplinary Notebook Management System 2.0.  *Id.*  It therefore appears that "all ODNMS records since inception," Estes Decl. ¶ 5, Ex. A at 3, may be found in at least three repositories: (1) an archive file in Lotus Notes that dates back to approximately 1993, (2) internal spreadsheets spanning approximately 2003 to 2011, and (3) the current, continually updated, ODNMS 2.0 that contains misconduct and substandard performance cases from 2012 to the present.

ii.    *Current Format*

Data in ODNMS 2.0 is organized within individual case entries.  2nd Estes Decl. ¶ 4.

These case entries are "akin to a personnel folder assigned to an officer for whom there is an

allegation of misconduct and/or substandard performance."  *Id.* ¶ 7.  As of February 2024,

ODNMS 2.0 contained more than 4,400 misconduct, substandard performance, and promotion

case entries.  Estes Decl. ¶ 24.[2]  Approximately 533 of those cases are active.  2nd Estes Decl.

¶ 33.[3]  A case entry is active if the allegations of an officer's misconduct or substandard

performance are pending administrative resolution.  *Id.* ¶ 10.  Case entries are closed once the

underlying allegations have been resolved in accordance with the Marine Corps' internal

regulations and the appropriate authority has approved administrative resolution of the case.  *Id.*

A case entry may be closed when initial allegations are not substantiated, upon completion of

criminal proceedings associated with the initial allegations, or upon completion of administrative

proceedings.  Estes Decl. ¶ 31.

Before a case is closed, staff judge advocates must upload various reports directly to the

case entry for the officer under investigation.  2nd Estes Decl. ¶ 27.  In cases where a

commanding officer determines that no misconduct occurred, the command will upload a report

that explains the investigative efforts taken and how the command reached its conclusion.  *Id.*

¶ 28.  Alternatively, if the commanding officer determines that misconduct occurred, it will

upload a report that "provides a complete record of the misconduct," as well as "a

---

[2] Promotion case entries are for officers whose promotion is delayed or withheld.  2nd Estes
Decl. ¶ 9.  Promotion case entries look identical to misconduct and substandard performance
case entries, except for two additional sections: (1) whether the officer's promotion is being
delayed or withheld, and (2) what type of promotion selection board the officer is pending.  *Id.*

[3] Between Estes's first declaration in June 2023 and her second in February 2024, active cases
increased from 346 to 533.  *Comp.* Estes Decl. ¶ 24, *with* 2nd Estes Decl. ¶ 33.

recommendation from the commanding officer on whether the officer should be administratively separated," and a copy of any investigation and all the evidence considered by the commanding officer.  *Id.*; *see also id.* ¶ 29 (listing other reports appended to active case entries).[4]  The Estes declarations do not state precisely when these reports are uploaded to an active ODNMS 2.0 case entry or whether all active cases include one or more reports.  Attorneys within the Military Personnel Law Branch compile active case entries that are ready for a final determination and transmit the case entry, relevant reports, their legal advice, and a draft decision to the Deputy Commandant of the Navy.  *Id.* ¶ 16.  After a case is closed in ODNMS 2.0, any uploaded reports are transferred to a separate internal storage database for archiving.  *Id.* ¶¶ 27, 31.  In other words, closed cases do not include the reports underlying their ultimate dispositions.

Every case entry in ODNMS 2.0, whether active or closed, contains an individual officer's "personal information" and "case information."  *Id.* ¶ 11.  Personal information in the database includes an officer's name, rank, command and unit, marital status, and whether the officer had a previous Officer Disciplinary Notebook entry and, if so, the date of the entry.  Estes Decl. ¶ 26; *see also* 2nd Estes Decl. ¶ 12 (listing 18 categories of personal information).  An entry's case information section contains a brief description of the allegation as first reported by the local staff judge advocate and chronological date entries on the status of the case.  Estes Decl. ¶ 26; *see also* 2nd Estes Decl. ¶ 13 (listing 7 categories of case information).  During this litigation, Plaintiffs informed counsel for the Marine Corps that they would not object to "redactions of officer names and certain other identifying information so long as a number system was employed to allow Plaintiffs to identify" when multiple entries related to the same officer.  Pls.' Cross-MSJ at 8; *see also* Nordlinger Decl. ¶ 2.

---

[4] A similar process occurs for cases involving allegations of substandard performance.  *Id.* ¶ 30.

A staff judge advocate creates a new case entry in ODNMS 2.0 when he or she receives "credible information" regarding alleged, suspected, or reported misconduct committed by a Marine officer.  MCO 5800.16 ¶ 010402(A).  "Credible information" is "intended to be a low threshold."  *Id.* ¶ 010403(A)(1).  Internal regulations describe the circumstances that trigger an initial case entry as any alleged, suspected, or reported misconduct for which court-martial, civilian prosecution, or administrative discharge proceedings "is possible under existing statutes and regulations," as well as any incident that results in incarceration in a civilian, foreign, or military detention facility.  *Id.* ¶¶ 010403(A), 010405.[5]  A new case entry requires biographical data regarding the officer alleged to have committed misconduct or substandard performance; a detailed statement of the allegation, including the time, date, and location of the alleged offense; if the incident involves law enforcement, the name of the city/county/state/federal law enforcement agency; and, in cases involving a DUI arrest, the officer's BAC level and whether any person was injured or any property damaged.  Estes Decl. ¶ 29; MCO 5800.16 ¶ 010405(A).

After the initial case entry, the responsible staff judge advocate must update the entry to reflect "significant events in the chronology section of the ODNMS" immediately when they occur, and must update the case entry at least monthly.  MCO 5800.16 ¶ 010405(B); *see also* Estes Decl. ¶ 30.  "Significant events" are those that "may affect the disposition of a case or increase the public attention drawn to it" and include new reports; new allegations of misconduct; referral, withdrawal, or dismissal of charges; acceptance of a pre-trial agreement; the delay or conclusion of a court-martial, board of inquiry, or civilian court proceeding; or a finding that misconduct did not occur.  MCO 5800.16 ¶ 010405(B)(1).  In the absence of any

---

[5] To give a concrete example, "minor traffic offenses need not be reported," but all DUI or DWI allegations must be reported.  MCO 5800.16 ¶ 010403(A)(1).

significant events, certification is required before the 20th of each month to ensure that "all cases are reviewed every month, even in the absence of developments in a case."  MCO 5800.16 ¶ 010405(B)(2).  An update to the chronology section of a case entry typically includes a brief description of the administrative action that took place on the specific date.  2nd Estes Decl. ¶ 14. For example, when printed, a case entry in the ODNMS might look like:

```
Brezler, Jason C.
XXX XX XXXX/1302
Maj, USMCR
DOR:  20100601
Marine Corps Individual Reserve Support Activity (MCIRSA), MFR
Single
Not selected for promotion

Allegation:  SNO is alleged to have caused a spillage of classified material
between NIPR and SIPR networks.

Chronology/Status:
20 Oct 12:  SNO is entered onto MARFORRES ODN.  NCIS initiating investigation.
            [0]
20 Nov 12:  NCIS investigation ongoing.  [31]
20 Dec 12:  NCIS interim report reveals more potential misconduct relating to
            mishandling of classified material.  [61]
05 Jan 13:  SNO voluntarily drops to the Inactive Ready Reserve after he is
            relieved of his duties and now belongs to Force Headquarters
            Group (FHG).  [77]
20 Jan 13:  Pending update to status of NCIS investigation.  [92]
20 Feb 13:  NCIS investigation complete.  SNO's command requests DONCAF security
            clearance review.  [123]
20 Mar 13:  DONCAF collecting information in order to make security clearance
            determination.  [151]
20 Apr 13:  DONCAF in process of security clearance review.  [182]
20 May 13:  DONCAF in process of security clearance review.  [212]
20 Jun 13:  Security clearance review in progress.  [243]
20 Jul 13:  DONCAF security clearance review ongoing.  [273]
02 Aug 13:  MFR Security Manager inquires to DONCAF IRT security clearance review.
            [286]
20 Aug 13:  Awaiting response to inquiry with DONCAF. [304]
```

Nordlinger Decl. ¶ 5, Ex. 3.  This excerpt is taken from Marine Corps Colonel Eric Kleis's declaration in *Brezler v. Mills et al.*, No. 14-cv-07424-JFB-GXB (E.D.N.Y. Nov. 8, 2016), ECF No. 78, and reflects the Marine Forces Reserve Officer Discipline Notebook for August 2013. *Id.*[6]

---

[6] These chronology entries contain "minimal substantive information on the administrative processing of the allegations" and are meant only to apprise the Military Personnel Law Branch of the status of the active case.  2nd Estes Decl. ¶ 19.

iii.    _Use_

The Marine Corps' internal regulations direct high-ranking officers to use the ODNMS to "report and track all officer misconduct and substandard performance cases" to "ensure [their] timely, efficient, and accurate processing."  MCO 5800.16 ¶ 10203(C).  The Marine Corps tracks these incidents to comply with federal law:  Military officer promotion boards must review any credible adverse information when considering an officer for promotion, 10 U.S.C. § 615(a)(3), and promotions to the next grade may delayed if the officer is pending a criminal investigation, civil or military criminal proceedings, or administrative proceedings for misconduct, _id._ § 624(d).  HMC "uses the Officer Disciplinary Notebook and the Officer Disciplinary Notebook Management system to ensure the Marine Corps complies with its statutory obligations in managing its officer personnel."  Estes Decl. ¶ 16.

## C.    **The Navy's Response**

HMC interpreted Plaintiffs' FOIA request as a request for "all of the data in Officer Disciplinary Notebook Management System 2.0 starting from 2012, the oldest document uploaded to the Officer Disciplinary Notebook Management System 2.0."  Estes Decl. ¶ 6.  The Marine Corps did not conduct a search of the ODNMS after receiving Plaintiffs' FOIA request. _Id._ ¶ 8.  It denied the request in full, explaining that the Navy's Office of the Judge Advocate General ("JAG") "has previously determined that the ODNMS and its contents constitute attorney work-product."  _Id._ ¶¶ 9–10 & Ex. B at 1.  The denial explained that the ODNMS and its contents were therefore "protected from disclosure by FOIA exemption (b)(5), which precludes the release of information that is privileged (attorney/client communications or attorney work-product) or deliberative in nature."  _Id._ ¶ 9 & Ex. B at 1.  The denial did not include case law or analysis supporting or explaining the JAG's prior decision.

Brennan filed an administrative appeal and challenged the "blanket claim that Exemption 5 protects the ODNMS database from disclosure." *Id.* ¶ 11, Ex. C at 3. He explained that conclusory statements that every fact "relating to the ODNMS database is attorney work-product do[] not meet the basic legal requirement to show any facet of the database actually falls within the scope of Exemption 5," especially where factual information is protected only where it is "inextricably intertwined" with an attorney's opinion. *Id.* He argued that HMC had not identified the litigation for which each document was created nor explained how the privilege applied to all portions of each document. *Id.* He also challenged the denial's failure to describe how particular withholdings under Exemption 5 would harm the agency's deliberative process. *Id.* at 3–4.

The JAG denied his appeal. *Id.* ¶ 12, Ex. D. It explained that staff judge advocates were responsible for inputting all ODNMS entries and updating information regarding an officer's misconduct or substandard performance case, and that "[i]n all cases, the entries are prepared in reasonable anticipation of litigation—wh[e]ther in the military justice system under the Uniform Code of Military Justice, in administrative proceedings, or in defensive federal litigation." *Id.*, Ex. D at 2. The JAG maintained that even when "administrative or criminal proceedings did not ultimately result in each recorded ODNMS case," the entries within the ODNMS "were prepared in contemplation of some form of litigation or administrative proceeding." *Id.* at 6. And because the work-product privilege "protects both the decision process and factual materials considered within each ODNMS entry, the ODNMS database was properly withheld in its entirety." *Id.* While it acknowledged that the original denial did not assert any foreseeable harm from disclosure, the JAG found that releasing information in the ODNMS "would cause attorney

advisors providing input in these cases to be less than candid in future similar situations." *Id.*[7]

No records have been produced to date.  Pls.' Cross-MSJ at 8.

## II.    LEGAL STANDARD

Because it considers evidence outside the pleadings, the court treats the motion as one for

summary judgment.  *See Ctr. for Immigr. Stud. v. U.S. Citizenship & Immigr. Servs.*, 628 F.

Supp. 3d 266, 269 (D.D.C. 2022).  Summary judgment is appropriate "if the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When

the movant is a federal agency in a FOIA case, the court views all facts and inferences in the

light most favorable to the requester, and the agency bears the burden of showing that it has

complied with FOIA.  *Chambers v. U.S. Dep't of Interior*, 568 F.3d 998, 1003 (D.C. Cir. 2009).

A district court's review of the agency's decision to withhold requested documents under

FOIA's specific statutory exemptions is *de novo*.  5 U.S.C. § 552(a)(4)(B).

Courts generally rely on "government affidavits to determine whether the statutory

obligations of the FOIA have been met," and agency affidavits are entitled to a presumption of

good faith.  *Perry v. Block*, 684 F.2d 121, 126 (D.C. Cir. 1982); *see also SafeCard Servs., Inc. v.

SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).  If an agency affidavit describes its reasons for

withholding information in sufficient detail and is not contradicted by contrary evidence in the

record or evidence of the agency's bad faith, then summary judgment may be warranted on the

basis of the affidavit alone.  *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 619 (D.C. Cir. 2011).

---

[7] The JAG concluded that because it found the ODNMS protected by the work-product privilege, there was "no need to conduct any analysis concerning either the attorney-client privilege or the deliberative process privilege, both of which are nonetheless applicable, at least in part, to each ODNMS entry."  *Id.* at 7.

The agency's justification for invoking a FOIA exemption is sufficient if it appears "logical" or "plausible." *Id.* (quoting *Larson v. U.S. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)) (internal quotations omitted).

FOIA is designed "to pierce the veil of administrative secrecy and to open agency action to the light of public scrutiny." *Dep't of Air Force v. Rose*, 425 U.S. 352 (1976). To that end, federal agencies are required to disclose records to the public on request unless a record is protected by one of nine statutory exemptions. 5 U.S.C. § 552(b). These exemptions "are explicitly made exclusive and must be narrowly construed." *Milner v. Dep't of Navy*, 562 U.S. 562, 565 (2011). The agency bears the burden of showing that any of the nine enumerated exemptions apply to withheld information. *Mobley v. CIA*, 806 F.3d 568, 580 (D.C. Cir. 2015). The burden to prove that a record is exempt from disclosure remains with the government even when a requester has filed a cross-motion for summary judgment. *See Hardy v. ATF*, 243 F. Supp. 3d 155, 162 (D.D.C. 2017) (quoting *Pub. Citizen Health Research Grp. v. FDA*, 185 F.3d 898, 904-05 (D.C. Cir. 1999)).

### III.    ANALYSIS

Rather than search for responsive records in this FOIA suit, HMC chose to move directly to cross-motions for summary judgment. That choice ignored Defendants' most basic obligation under FOIA and asks the court to evaluate the Marine Corps' withholding without requiring Defendants to perform the elementary tasks of searching for and segregating releasable information. Because the court cannot evaluate Defendants' claimed exemptions on this record, it will return this case to the agencies to perform these tasks, with guidance on fulfilling their obligations.

A.      **The Records Sought**

A FOIA request is not valid unless it "reasonably" describes the records sought.  5 U.S.C.

§ 552(a)(3)(A); *see Nat'l Sec. Couns. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020).  "A request

reasonably describes records if the agency is able to determine precisely what records are being

requested." *Evans v. Fed. Bureau of Prisons*, 951 F.3d 578, 583 (D.C. Cir. 2020) (internal

quotations omitted).  A request satisfies this standard where "a professional employee of the

agency who was familiar with the subject area of the request [could] locate the record[s] with a

reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990).

In undertaking this effort, and in light of FOIA's pro-disclosure purpose, an agency has "a duty

to construe a FOIA request liberally." *Evans*, 951 F.3d at 583 (citation omitted).  It "should

determine whether, construing the request liberally, it in fact has created and retained responsive

records." *Id.* at 584 (internal quotations omitted).

The Marine Corps knew what Plaintiffs' FOIA request sought when it issued its denial.

The request is self-explanatory— it sought "a full copy of the Officer Disciplinary Notebook

Management (ODNMS) database" and pointed HMC to "[t]he location, use, and description of

the ODNMS" via a link to the Marines Corps' own website.  Estes Decl. ¶ 5, Ex. A at 3; *see also*

Nordlinger Decl. ¶ 4.  To use Plaintiffs' analogy, the request "pointed the agency to the specific

filing cabinet where the records are held."  Pls.' Cross-MSJ at 11; *Inst. for Just. v. IRS*, 941 F.3d

567, 571 (D.C. Cir. 2019) (collecting sources illustrating that this Circuit applies standard FOIA

principles to paper records and electronic databases alike in evaluating the adequacy of an

agency's search).  It then called for a "full copy" of the filing cabinet, asking the agency to

conduct a simple analysis:  if the record is in the ODNMS, it is responsive; if the record is not in

the ODNMS, it is not.  Reply in Supp. of Pls.' Cross-Mot. for Summ. J. at 2 ("Pls.' Reply"), ECF

No. 37.

More tellingly, agency employees not only *could* identify the requested records, but in fact *did* identify the records sought.  Both the Marine Corps' and Navy's denial letters not only acknowledged that Plaintiffs sought the ODNMS but also identified it correctly as "a database used to track officer misconduct and substandard performance in the Marine Corps," Estes Decl. ¶ 12, Ex. D at 2, and concluded that the Navy had made a prior determination that "the ODNMS and its contents constitute attorney work-product," *id.* ¶ 9, Ex. B at 1.  There can be no doubt that the agencies knew they had "in fact . . . created and retained responsive records" where they asserted the work-product privilege over "the entries within the ODNMS database that your client seeks."  *Evans*, 951 F.3d at 584; Estes Decl. ¶ 12, Ex. D at 6.

The agency declarant's statement that "the request fails to specify what information Mr. Brennan desires," Estes Decl. ¶ 34, is not entitled to the presumption of good faith where it is contradicted by contrary evidence in the record—the contemporaneous denial letters acknowledging and identifying the records sought—and the declarant's statements in her own declarations.  *Cf. ACLU*, 628 F.3d at 619.  It strains credulity to believe that HMC is "unclear" as to what records the request seeks where the agency declarant not only identified the scope of the request, Estes Decl. ¶ 7,[8] but also calculated the time to process it, *id.* ¶ 35.  HMC MSJ at 11. Defendants' argument that HMC cannot determine whether Plaintiffs' request includes previous versions of the ODNMS or solely ODNMS 2,0, *see id.* at 12, also lacks indicia of good faith. *See* Pls.' Cross-MSJ at 12–13.  Nowhere does HMC's declarant attest that she is unsure which version Plaintiffs request, and her overview of the historical development of the ODNMS appears to acknowledge that the request seeks exactly what it asks for: "all ODNMS records

---

[8] The agencies' declarant acknowledged that the "broad nature of Mr. Brennan's request captures all of the data housed on the Officer Disciplinary Notebook Management System."  Estes Decl. ¶ 34.

since inception." Estes Decl. ¶ 5, Ex. A at 3; *see also id.* ¶¶ 20–23. A request calling for "all ODNMS records since inception" makes plain that Plaintiffs requested all records in the ODNMS beyond the ten years of cases transferred to ODNMS 2.0. Pls.' Cross-MSJ at 13.

The court has little trouble concluding that Plaintiffs' request adequately described the records sought and grants summary judgment to Plaintiffs on this issue.

**B.    Reasonably Calculated Search**

An agency responding to a valid FOIA request must "conduct a search reasonably calculated to uncover all relevant documents, and, if challenged, must demonstrate beyond material doubt that the search was reasonable." *Truitt*, 897 F.2d at 542 (cleaned up). An agency need not "search every record system" or "demonstrate that all responsive documents were found and that no other relevant documents could possibly exist." *Watkins L. & Advoc., PLLC v. U.S. Dep't of Just.*, 78 F.4th 436, 442 (D.C. Cir. 2023) (citation omitted). But it must provide a "reasonably detailed affidavit, setting forth the search terms and the type of search performed, and averring that all files likely to contain responsive materials (if such records exist) were searched." *Cabezas v. FBI*, 109 F.4th 596, 602 (D.C. Cir. 2024) (quoting *Oglesby v. U.S. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990)).

HMC concedes that it did not conduct a search of the ODNMS after receiving Plaintiffs' FOIA request. Estes Decl. ¶ 8. It instead relies on blanket claims of withholding—addressed below—supported by a declaration submitted to "explain why the Headquarters Marine Corps did not conduct a search for the Officer Disciplinary Notebook Management System" in response to Plaintiffs' request. *Id.* ¶ 3. It argues that it was not obligated to search the ODNMS because "complying with [Plaintiffs'] FOIA request would be an unduly burdensome task." *Id.* ¶ 33. Defendants are correct that an agency can decline to process a request when it "would require an agency to undertake an unreasonably burdensome search," but Plaintiffs' request does

not fit that mold. *Nat'l Sec. Couns.*, 969 F.3d at 410. And HMC's attempt to stretch the rule to exempt it from FOIA's core obligation to *review* and *produce* responsive, non-exempt records is unsupported by this district's case law. *See* 5 U.S.C. § 552(a)(3).

"The fundamental principle animating FOIA is public access to government documents." *Valencia-Lucena v. U.S. Coast Guard*, 180 F.3d 321, 325 (D.C. Cir. 1999) (citation omitted). "The law in this circuit on agency obligations" under FOIA "embraces" this purpose even though "the number of requests may pose burdens on agencies." *Id.* (citations omitted). "Typically, courts discuss the agency's burden and the feasibility of segregating exemption information in the context of the agency's ability to identify the universe of records relevant to a request." *Ayuda, Inc. v. FTC*, 70 F. Supp. 3d 247, 276 (D.D.C. 2014) (citation omitted). And when a "request as drafted would require an agency to undertake an unreasonably burdensome search, the agency can decline to process the request." *Nat'l Sec. Couns.*, 969 F.3d at 410. That means that an "agency need not honor a request that requires an unreasonably burdensome search" because such a request does not "reasonably describe[]" the documents sought, as required by 5 U.S.C. § 552(a)(3)(A). *Am. Fed'n of Gov't Emps. v. U.S. Dep't of Com.*, 907 F.2d 203, 208–09 (D.C. Cir. 1990) (internal quotations omitted).

Here, HMC's search is simple and does not require it to expend excessive resources to identify relevant records. *See Ayuda*, 70 F. Supp. 3d at 276. As the court has explained, the requested records are easily identified, already located, and require a straightforward responsiveness review. *Supra* at 14–16. By HMC's own declaration, responsive records are located in no more than three repositories. *See* Estes Decl. ¶¶ 20–23. And the records within those databases do not need to be individually reviewed for responsiveness. Pls.' Reply at 2. Instead, if a record is in the ODNMS, it is responsive; if a record is not in the ODNMS, it is not.

In short, Defendants' *search* for responsive records will require nowhere near the thousands of hours courts in this district have found to impose an undue burden.  *See Anand v. U.S. Dep't of Health & Hum. Servs.*, No. 21-cv-1635-CKK, 2023 WL 3600140, at *4 (D.D.C. May 23, 2023) (collecting cases and holding that a search requiring 28 years and millions of dollars "to search for records responsive to" plaintiff's FOIA request imposed undue burden).

Undeterred, HMC attempts to fit its refusal to *review* records in the ODNMS into FOIA's rule that an agency need not undertake an overly burdensome *search*.  It argues that "just as courts have held that an agency need not undertake a search for documents that would place an inordinate strain on agency resources, the same rationale would apply to a review and segregability analysis that would place an undue burden on the Navy."  HMC MSJ at 17.  The court is unpersuaded by Defendants' claim that HMC is "not required to review potentially responsive and non-exempt records because doing so 'would be overly burdensome.'" *100Reporters v. U.S. Dep't of State*, 602 F. Supp. 3d 41, 66 (D.D.C. 2022).  Tellingly, all but one of Defendants' supporting citations held that an unduly burdensome search, not review, negated the agency's obligation to process the FOIA requests at issue.  Those cases do not support the agencies' position because HMC "has already located the responsive records and thus need not conduct any additional search; the only issue is whether it must spend the time to review those records to make redactions."  *Kwoka v. IRS*, No. 17-cv-1157-DLF, 2018 WL 4681000, at *5 (D.D.C. Sept. 28, 2018).

Defendants' remaining citation involves a *sui generis* holding "based on the unique facts" of that case.  *Ayuda*, 70 F. Supp. 3d at 276.  Several plaintiffs sued the Federal Trade Commission ("FTC") seeking information from its Consumer Sentinel database, an "online repository containing millions of consumer complaints about alleged illegal business activity."

*Id.* at 254.  As here, the FTC had no trouble locating the database and did not argue that it was incapable of searching for or retrieving the Consumer Sentinel database records.  *Id.* at 276.  "Instead, the agency's argument for non-disclosure focuse[d] only on the burden of manually identifying and redacting the exempt information across the already retrieved twenty million responsive records" in the database.  *Id.*  The court was therefore faced with the question whether the FTC could "withhold the entire universe of information contained in the data fields" even though only a small percentage of the information was exempt, but redacting the exempt information would require an "unreasonably burdensome manual review."  *Id.*

The court held that the unique "facts and equities" of the case compelled it to find that the FTC properly withheld the "entire universe of information given the burden of removing the subset of exempt information."  *Id.*  It couched its decision in several caveats, most importantly that it was not faced with "a situation in which an agency seeks to protect its own potentially confidential information—such as agency information covered by the deliberative process privilege—by withholding a substantially broader set of information that does not contain privileged information."  *Id.* at 277.[9]  It also reasoned that if the plaintiffs had "sought a smaller, more manageable universe of records and not the twenty million complaints" in the Consumer Sentinel database, the solution might have been "simple"— the court "could order the FTC to expend a reasonable amount of resources to identify and redact the exempt personal information from each complaint."  *Id.* at 276.  Plaintiffs' request here is more analogous to the *Ayuda* caveats:  HMC seeks to protect its own potentially confidential information, relying on the

---

[9] The redacted information sought to protect the privacy interests "of third-party citizens by preventing the disclosure of their personal identifying information."  *Id.* at 276–77.

Exemption 5 privileges including the deliberative process privilege. *Cf. id.* at 276–77.[10]  And the 4,400 records at issue in this case are a much "smaller, more manageable universe of records" than the twenty million complaints at issue in *Ayuda*. *Id.* at 276.  The court therefore declines to extend the reasoning in *Ayuda* to this case.

Even taking HMC at its word that "review and analysis for redactions due to applicable FOIA exemptions" would require at least 1 hour per case entry, the court does not find roughly 8,500 hours of review time "unreasonably burdensome."  Estes Decl. ¶ 35 (approximately 4,400 hours reviewing case entries and 4,152 hours reviewing active case reports);[11] *see, e.g.*, *100Reporters*, 602 F. Supp. 3d at 66–67 (rejecting agency's "categorical approach" and requiring review of 45,000 rows of information, including "NOTES" column containing "descriptions of major milestones in the vetting process").  As courts in this district frequently allow, when it comes to "setting a production schedule, the [Marine Corps] may limit the amount of time spent on this particular request to a reasonable number of hours or records per month." *Kwoka*, 2018 WL 4681000, at *5.  But where HMC "already has all the requested records in its possession," the court "will not allow it to withhold the documents wholesale simply because it will (potentially) take" several thousand hours to review them for redactions. *Id.*

---

[10] The court in *Ayuda* noted that if the agency were instead seeking to withhold its own information, it might have "require[d] the FTC to decide between performing the burdensome manual review or producing its privileged information unredacted." *Id.* at 277.

[11] The court's conclusion credits HMC's estimation that reviewing active case reports will take another 4,152 hours, Estes Decl. ¶ 35, even though Plaintiffs have stated that they do not oppose redacting the personal health information that is likely found in the reports.  Pls.' Cross-MSJ at 37, n.9; *see id.* at 16 (contrasting other agencies' estimates of time to review large databases of records).  However, searching additional repositories for case entries dating back to 1993 may make these estimates more realistic.

The court denies Defendants' motion for summary judgment on the ground that Plaintiffs' FOIA request is unduly burdensome.  Because Defendants have not made any representations regarding the burden of searching for records in the repositories outside ODNMS 2.0, the court declines to grant summary judgment to Plaintiffs on the issue of HMC's *search* burden at this time.  On remand, Defendants are directed to search (1) the archive file maintained in Lotus Notes that dates to approximately 1993, (2) internal spreadsheets spanning approximately 2003 to 2011, and (3) the current ODNMS 2.0 that contains misconduct and substandard performance cases from 2012 to the present.  If these repositories do not exist, or exist in different formats than the court understands from the Estes declarations, the agencies can supplement their declarations in a subsequent motion for summary judgment.

## C.    <u>Segregability</u>

Agencies may withhold certain materials under FOIA's exemptions but must release "any reasonably segregable portions" of responsive documents after redacting the exempt information. *See* 5 U.S.C. § 552(b).  "Producing segregable information is an essential ingredient for agencies' FOIA compliance." *Ctr. for Investigative Reporting v. U.S. Customs & Border Prot.*, 436 F. Supp. 3d 90, 114 (D.D.C. 2019).  "Even if an exemption covers an entire agency record, the agency still must release any reasonably segregable information within the record that could be disclosed without causing reasonably foreseeable harm to an interest that the exemption protects." *Leopold v. Dep't of Just.*, 94 F.4th 33, 37 (D.C. Cir. 2024).  And before approving the application of any FOIA exemption, a district court "must make specific findings of segregability regarding the documents to be withheld." *Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1116 (D.C. Cir. 2007).

To assess segregability, a "district court must be provided with a 'relatively detailed description' of the withheld material." *Farahi v. FBI*, 643 F. Supp. 3d 158, 175–76 (D.D.C.

2022) (internal citations omitted).  It is the agency's burden to show with "reasonable specificity why the documents cannot be further segregated." *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578 (D.C. Cir. 1996) (internal quotation omitted).  To do so an agency "must provide a detailed justification and not just conclusory statements to prove that it has released all reasonably segregable information." *Am. Oversight v. U.S. Dep't of the Treasury*, 474 F. Supp. 3d 251, 273 (D.D.C. 2020).  Generally, "[a]ffidavits attesting to the agency's line-by-line review of each document withheld in full and the agency's determination that no documents contained releasable information which could be reasonably segregated from the nonreleasable portions, in conjunction with a Vaughn index describing the withheld record, suffice." *Ecological Rts. Found. v. EPA*, 541 F. Supp. 3d 34, 66 (D.D.C. 2021).

The Estes declarations demonstrate that HMC did not even attempt to segregate potentially responsive, non-exempt information.  Estes Decl. ¶ 8 (HMC "did not conduct a search within" the ODNMS database).  As a result, Defendants did not produce a non-conclusory affidavit attesting to a line-by-line review of each document withheld in full, much less a Vaughn index describing the withheld information.  *Cf. Ecological Rts. Found.*, 541 F. Supp. 3d at 66. Defendants' wholesale approach does not allow the court to make "specific findings of segregability" regarding the ODNMS records withheld.  *Sussman*, 494 F.3d at 1116.  The court will therefore deny both parties' motions with respect to the contested exemptions.  But because Defendants claim that at least one exemption "protects all entries in the Officer Disciplinary Notebook Management System," it will address the parties' arguments as to Exemption 5 below while reserving judgment as to the remaining claimed exemptions until HMC develops an adequate record for the court to evaluate any future withholdings.  Estes Decl. ¶ 42.

i.     _The work-product privilege in FOIA litigation_

HMC's primary justification for withholding the ODNMS is that it is attorney work

product and therefore wholly exempt from disclosure under Exemption 5.  HMC MSJ at 22.

FOIA Exemption 5 covers "inter-agency or intra-agency memorandums or letters that would not

be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

§ 552(b)(5).  It protects documents that would be privileged in ordinary civil litigation, _see_

_Loving v. Dep't of Def._, 550 F.3d 32, 37 (D.C. Cir. 2008), and it "incorporates the work-product

doctrine and protects against the disclosure of attorney work product," _Jud. Watch, Inc. v. Dep't_

_of Just._, 432 F.3d 366, 369 (D.C. Cir. 2005).  Exemption 5 also incorporates the attorney-client

privilege and the deliberative process privilege, which protects "documents reflecting advisory

opinions, recommendations and deliberations comprising part of a process by which

governmental decisions and policies are formulated."  _Loving_, 550 F.3d 32, 38 (D.C. Cir. 2008).

The work-product privilege protects documents and memoranda prepared by an attorney

in contemplation of litigation or administrative proceedings.  _Schoenman v. FBI_, 573 F. Supp. 2d

119, 143 (D.D.C. 2008).  "Not every document created by a government lawyer" qualifies for the

privilege.  _Nat'l Ass'n of Crim. Def. Laws. v. U.S. Dep't of Just. Exec. Off._, 844 F.3d 246, 251

(D.C. Cir. 2016).  Instead, this Circuit requires a "case-specific determination that a particular

document in fact was prepared in anticipation of litigation before applying the privilege to

government records."  _Id._  To determine whether a document was prepared in anticipation of

litigation, the court must "ask whether, in light of the nature of the document and the factual

situation in the particular case, the document can fairly be said to have been prepared or obtained

_because of_ the prospect of litigation."  _E.E.O.C. v. Lutheran Soc. Servs._, 186 F.3d 959, 968 (D.C.

Cir. 1999) (cleaned up) (emphasis added); _see also Nat'l Ass'n of Crim. Def. Laws._, 844 F.3d at

251 (same).  To meet that standard, "the attorney who created the document must have 'had a

subjective belief that litigation was a real possibility,' and that subjective belief must have been 'objectively reasonable.'" *Nat'l Ass'n of Crim. Def. Laws.*, 844 F.3d at 251 (quoting *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)).  If a document "would have been created 'in substantially similar form' regardless of the litigation, work-product protection is not available." *Ellis v. U.S. Dep't of Just.*, 110 F. Supp. 3d 99, 108 (D.D.C. 2015) (quoting *United States v. Deloitte LLP*, 610 F.3d 129, 138 (D.C. Cir. 2010), *aff'd*, No. 15-5198, 2016 WL 3544816 (D.C. Cir. June 13, 2016)).

To show that the privilege applies to a given document, an agency "must (1) provide a description of the nature of and contents of the withheld document, (2) identify the document's author or origin, (3) note the circumstances that surround the document's creation, and (4) provide some indication of the type of litigation for which the document's use is at least foreseeable." *Id.*  Once the government shows that the work product-privilege applies to a document, it can take advantage of the fact that the "work-product privilege is broader than Exemption 5's other civil discovery privileges because it protects factual material contained within the attorney work-product from disclosure." *Jud. Watch, Inc.*, 432 F.3d at 371.  This is because "factual elements can 'seldom' be segregated from attorney work product." *Louise Trauma Ctr., LLC v. U.S. Dep't of Just.*, No. 20-cv-3517-RC, 2022 WL 278771, at *7 (D.D.C. Jan. 30, 2022) (quoting *Martin v. Off. of Special Couns.*, 819 F.2d 1181, 1186 (D.C. Cir. 1987)). As a result, if a withheld document "is *fully* protected as work product, then segregability is not required." *Id.* (emphasis added).

ii.    <u>The work-product privilege as applied to the ODNMS</u>

HMC contends that because case entries are created "for the specific purpose of advising commanders on officer personnel actions which are subject to administrative review and litigation," every ODNMS entry and the information it contains is subject to the work-product

privilege.  Estes Decl. ¶ 42.  Even if some cases "do not resolve in an administrative proceeding

or litigation, the cases and data entered for the case were prepared in contemplation of litigation

or administrative proceeding."  *Id.*  But the court finds a genuine issue of fact on this question,

especially where HMC's declarations state that "[t]he majority of information included in

individual case entries is kept for internal case management purposes" and used to "keep track of

the status of the misconduct and promotion cases for internal administrative purposes."  *Id.* ¶ 37.

While these goals are not necessarily at odds with preparing for future litigation, the court notes

that HMC developed and uses the ODNMS "to ensure the Marine Corps complies with its

statutory obligations in managing its officer personnel."  *Id.* ¶ 16.  Those obligations require

officer promotion boards to review credible adverse information when considering an officer for

promotion.  *See* 10 U.S.C. §§ 615(a)(3), 624(d).  In that light, tracking credible adverse

information is not undertaken for the purpose of preparing for litigation, but instead to comply

with Congress's directives.  And HMC must comply with internal Marine Corps regulations that

in turn ensure compliance with these statutory mandates.  *See* Estes Decl. ¶ 20 (Marine Corps

guidelines began requiring senior officers to establish an internal case tracking system for all

reported officer misconduct in 2003); MCO 5800.16 ¶ 10203(C) (directing HMC to use the

ODNMS to "report and track all officer misconduct and substandard performance cases" to

"ensure [their] timely, efficient, and accurate processing").  The court therefore cannot conclude

on this record that HMC would have produced a different ODNMS or filled it with different

information but for the prospect of future litigation.  *See Deloitte LLP*, 610 F.3d at 138.

Similarly, HMC argues that every case entry is created "for the specific purpose of future

litigation, either criminal, civil, or administrative," HMC MSJ at 22 (citing Estes Decl. ¶ 42),

because officer misconduct and substandard performance cases "are often subject to criminal or

civil litigation, and/or administrative proceedings," Estes Decl. ¶ 19. Defendants effectively ask the court to infer that every staff judge advocate who has ever opened a case entry in the ODNMS had an "objectively reasonable" "subjective belief that litigation was a real possibility." *Nat'l Ass'n of Crim. Def. Laws.*, 844 F.3d at 251 (citation omitted). But this Circuit has cautioned against sweeping too much government activity under the work-product privilege's protection. The court appreciates that potential future litigation "touches virtually any object of an [HMC] attorney's attention," but if Defendants "were allowed to withhold any document prepared by any person in the Government with a law degree simply because litigation might someday occur, the policies of the FOIA would be largely defeated." *Senate of Puerto Rico v. U.S. Dep't of Just.*, 823 F.2d 574, 586–87 (D.C. Cir. 1987) (internal quotation omitted). That is why HMC must meet its evidentiary burden to "provide some indication of the type of litigation for which the document's use is at least foreseeable." *Ellis*, 110 F. Supp. 3d at 108. It may ultimately be the case that each record in the ODNMS is covered by the privilege, but the declarations submitted by one HMC attorney without reference to a single case entry in the ODNMS do not allow the court to conclude that all 4,400 case entries and the records they contain were prepared in anticipation of litigation.[12]

Even if the court ultimately determines that records in the ODNMS are protected under the work-product privilege, Defendants' argument that attorney work-product information can never be segregated is incorrect. Pls.' Cross-MSJ at 21. HMC argues that it was not required to segregate and produce factual information from the ODNMS because it withheld all documents under the work-product privilege. HMC MSJ at 22–23; *accord* Reply in Supp. of Defs.' Mot. for

---

[12] This is especially true when the court considers that the ODNMS is distinct from the "Wolverine" database maintained by Marine Corps prosecutors to track their cases. Pls.' Cross-MSJ at 2.

J. on the Pleadings, or, in the Alternative, Summ. J. & Opp'n to Pls.' Cross-Mot. for Summ. J.at

18, ECF No. 35.  While it is true that where a *document* is "fully protected as work product, . . .

segregability is not required," the ODNMS is not a single document.  *Jud. Watch, Inc.*, 432 F.3d

at 371.  HMC's declarant instead analogized the ODNMS system to a filing cabinet with

personnel folders, and claims withholding over potentially tens of thousands of documents in this

digital filing cabinet without conducting any search or review of their contents.  2nd Estes Decl.

¶ 7.  But in cases where the privilege is asserted over "a large document or category of

documents that may contain non-privileged material," the rule that segregability is not required is

inapplicable.  *Louise Trauma Ctr.*, 2022 WL 278771, at *7 (collecting cases).  The court finds

that the unredacted ODNMS entry Plaintiffs provided raises a genuine issue whether the work-

product privilege applies to every segment of every document in the ODNMS.  *See* Nordlinger

Decl. ¶ 5, Ex. 3.  Defendants are therefore required to provide "a description of which parts of

the withheld documents are nonexempt . . . and either disclose them or offer adequate

justification for continuing to withhold them."  *Nat'l Ass'n of Crim. Def. Laws.*, 844 F.3d at 257

(citation omitted).[13]

## IV.   CONCLUSION

For the foregoing reasons, the court will DENY Defendants' Motion for Judgment on the

Pleadings or, in the alternative, Summary Judgment, ECF No. 21, and GRANT in part and

---

[13] The deliberative process privilege "does not protect documents in their entirety; if the
government can segregate and disclose non-privileged factual information within a document,
it must."  *Loving*, 550 F.3d at 38 (citation omitted).  To the extent HMC argues that the
privilege protects every portion of the reports attached to active case entries, it must produce a
Vaughn index that "specif[ies] in detail which portions of the document are disclosable and
which are allegedly exempt" and "correlate[s] statements made in the . . . refusal justification
with the actual portions of the document."  *Vaughn v. Rosen*, 484 F.2d 820, 827 (D.C. Cir.
1973); *accord Louise Trauma Ctr.*, 2022 WL 278771, at *4.

DENY in part Plaintiffs' Cross-Motion for Summary Judgment, ECF No. 28.  The matter is remanded to the Navy and HMC for further findings as to segregability.  A corresponding order will accompany this memorandum opinion.

Date: September 30, 2024

*Tanya S. Chutkan*

TANYA S. CHUTKAN
United States District Judge